## LORETTA WILLIAMS
vs.
## GLADYS STOTTS

Court of Common Pleas     Hartford County     File #295

Coram: Hon. THOMAS J. MOLLOY, Judge.

Thomas F. McDonough,        Attorney for the Plaintiff,

Harold Williams,
Harry Ginsburg        Attorneys for the Defendant.

**MEMORANDUM FILED NOVEMBER 20, 1937.**

MOLLOY, J.  This action of Habeas Corpus is brought to determine the question of the custody of Doris Ann Williams, the daughter of the Petitioner, Loretta Williams, and her husband, Charles Williams, and the niece of the Respondent, Gladys Stotts.  It is the proper proceeding for such a purpose. **Pfeiffer vs. Pfeiffer, 99 Conn. 154.**  Doris Ann Williams was born November 20, 1933, and is, therefore, four years old the 20th of this month.

The first hearing was held July 16, 1937.  It was continued for further hearing at the request of the Respondent, in order that additional evidence not available then, might be offered, particularly that of the paternal grandmother, Mrs. Ann Bagshaw, who was confined to a hospital.  Other delays due to the sickness of witnesses occurred, and finally the matter came on for trial October 26 and 27, 1937.  On November 15, 1937, an amended return was filed and a reply to that return was filed November 19th.

All the issues of the case have been thoroughly tried.  They involve the petition of a mother for the return and custody of the only girl of her four children.  It naturally presents therefore a rather trying situation for any judge to pass upon.  He must decide between the natural love and affection of a mother for her child and what is for the welfare and happiness of that child.

The first principle to bear in mind is that the mother is. the natural guardian of her child.  This needs no demonstration.  The mother ordinarily and naturally is entitled to its possession and custody unless a situation has developed in the life of the child's family and in her own life which warrants. custody being given to another just so long as those family conditions and situation continue.

Now there is another important consideration of which I am not unmindful, and that is that children, when it is possi-

ble, and with a due regard for their best interest and welfare, should live with their mother and in the same family group with their brothers and sisters, knowing one another as children and parents should.

Now admitting these two propositions, it is essential to remember also, that when a case of this character is presented for decision certain factors and conditions are usually developed which bring into play a third principle which has become a well settled rule of our law. It is this, that when there is a struggle for the custody of a child, the prime consideration before the Court is: What, in the light of the factors and conditions developed by the evidence, is for the best interest, welfare and happiness of the child?

> ". . . . the paramount consideration in determining this question of custody is the welfare and happiness of the child. And that involves not only her happiness at the moment but her chance of happiness in the future." Anderson vs. Anderson, 122 Conn. 600-603. Brazee vs. Brazee, p. 131, infra; Cozzolino vs. Cozzolino, p. 243, infra.

With these principles and considerations in mind the question which I must decide in the immediate case is this: Is it for the welfare and happiness of Doris Ann Williams that she go back to her mother, or remain with her aunt, the Respondent, in New Britain, until such time at least as there is a change for the better in the family conditions of her mother.

The story behind the family life of the innocent Doris Ann Williams is not a happy one, due to an unfaithful father who for his misdeeds is now paying his debt to society behind prison bars in the State of New York. Doris Ann was only about 14 months old when this occurred, leaving her mother and her three little brothers destitute and dependent on public charity for food, shelter and clothing. Her oldest brother is now about eight years old. She was the third child and her younger brother is now about 2½ years old.

Now it should be said at this point, that there is no question in my mind but that the mother is a good woman and a well intentioned mother. She has, however, gone through a terrific ordeal, with a husband given to excessive drinking and on occasion indulging in some wife-beating, the meanwhile his wife bearing him children; all culminating in the distressing

family situation she now and for some time past has endured.

With her husband in prison, with four children to take care of, with Doris Ann a year and a half old, afflicted with a paralyzed right arm, and a new baby three or four months old, and with her father just having died, and her little family destitute and existing on public charity, it is little wonder the Petitioner was well-nigh distraught. So it was in the early part of 1935 that she sought some way out of her intolerable condition. Her first thought was to put the children in a Home and herself go to work. She finally decided that Doris Ann, her only girl, was to be the one who should go to an orphan's home. There is no question from the evidence but that this was contemplated. Little Doris in her condition needed special care and proper medical attention. So along about April, 1935, the Petitioner and Respondent, Mrs. Stotts, corresponded about the latter taking Doris into her home and caring for her. It was finally agreed that Mrs. Stotts should do this, and the mother was apparently pleased with the arrangement. There had been talk of adoption and the Petitioner even undertook to give Doris Ann in adoption to Mrs. Stotts. This, however, was never consummated. While these negotiations were going on, the mother had made it plain to Mrs. Stotts that she wanted her child brought up in the faith of her baptism, Catholic. Though Mrs. Stotts never agreed to this, nevertheless, Doris Ann was finally in June, 1935, given over to her care. She has remained with her ever since. A year and a half later, or about December, 1936, the mother began writing to Mrs. Stotts to the effect that she would like her child back. Getting no definite answer from her, these proceedings were instituted in July last, two years after the child had gone to Mrs. Stotts. In the meantime Mrs. Stotts and her husband had become and now are deeply attached to Doris and do not want to give her up.

Now in determining the primary issue in this case,—what is for the best interest, welfare and happiness of the child,— much evidence was offered showing the home conditions of the respective families. It discloses these facts, among others: that the mother, a resident of Glen Cove, New York, lives with her three boys in a four-room flat with bath. This tenement is one of four in the same building. There are about twenty-four people, including eleven children, living in the house. The location of the tenement house cannot be said to

be an overcrowded tenement district, but apparently it is a district wherein the poor live. Mrs. Williams gets her tenement, heat, light, gas and clothing, with two bottles of milk a day free, together with $14.50 a week from the Welfare Department of Glen Cove for the support of herself and three boys. If Doris is returned to her, this weekly allowance will be raised, just how much does not appear. All bed linen, wearing apparel, and so forth, must be donated by the charity of Glen Cove or others who may be interested. At best, it is a most distressing situation in which Mrs. Williams finds herself, due to no fault of hers. But nevertheless that is her situation.

Now what are the living conditions prevailing for Doris now, and since she has been with Mrs. Stotts in New Britain? She is the only child in the Stotts family. The Stotts are, what most of us mortals are, middle class folks, Mr. Stotts being employed as a clerk for over 25 years by the Stanley Rule and Level Company, of New Britain. They are apparently a clean, decent, upright couple, and have provided for themselves, and mainly for the benefit of Doris Ann, a seven-room single home in the Belvedere section of New Britain. This section is apparently made up of home-owning people who take pride in their homes and in their surroundings. Doris has a room for herself and receives from Mr. and Mrs. Stotts the best of care and supervision. There is a nice lawn and shrubbery surrounding the home and a fine yard in back for Doris to play in. In the rear of the tenement house occupied by the mother in Glen Cove there is a small yard which is also used as a parking place for two or three automobiles Sundays and holidays, or parts thereof. The other place for Doris to play is in the street. Next to the tenement house is a vacant store, used up to a short time ago, as a tavern.

Now I do not refer to the Glen Cove surroundings in a sense of disparagement. I realize fully that good men and women, indeed, great men and women have come from just such surroundings. But I am to decide here and now what is for the welfare and happiness of a child and can only judge by the present. The conclusion is inevitable that the home and its surroundings in New Britain are much better than those in Glen Cove. I am conscious of the fact that this is not necessarily the controlling factor; but it is a feature of this case to be considered along with others.

Now when Doris came to Mrs. Stotts she was in a greatly undernourished condition. While with her mother she had received some medical treatment for her paralyzed right arm. Since coming to New Britain she has received constant medical attention and treatment at The Newington Home for Crippled Children, so that today her arm is practically cured. There is some question in my mind that this would be so if the child had continued with the mother, for Dr. Maurice Pike, orthopedic surgeon who treated Doris, testified that the brace given for the child in Glen Cove had apparently not been worn for some time prior to her coming to New Britain. This was admitted in part by the mother and poorly excused. In addition, Doris has received other necessary private medical attention which it is doubtful she would have received in Glen Cove.

There was considerable further evidence offered as to other living conditions at the mother's home which might have arisen in any poor family; they are not to be taken too seriously. But there were other conditions and occurrences in this home which in view of the excellent and fine conditions under which Doris is now living can only be considered in a light persuasive of a decision to leave her where she is.

The paternal grandmother, Mrs. Bagshaw, was a frequent visitor to the Petitioner's home. She was apparently very friendly with her daughter-in-law, and I think now has a friendly attitude toward her. She testified to some things occurring while she was there which at the time would hardly be considered serious, but which are apt to be magnified, when viewed in retrospect, to the disadvantage of the mother. Mrs. Bagshaw, however, testified to other things which are not to be lightly considered and which the Petitioner admitted, but which in each instance she attempted to minimize or excuse. For instance, Mrs. Bagshaw testified the Petitioner's brother was addicted to excessive drink; that he called at the Petitioner's home practically every day soliciting most of the time from her money to get drink. The Petitioner would give him ten or fifteen cents on most of these occasions, and it apparently was used by him for drink. Indeed, on one occasion he was refused and a duel of profanity occurred between the brother and sister which could hardly be considered edifying for children. Mrs. Williams attempted to minimize her brother's condition saying that the "poor fellow" had the

disease of drinking, otherwise he was all right, although he had worked rarely in the last four or five years. Mrs. Bagshaw also testified that on another occasion, in a moment apparently when Mrs. Williams was very despondent, she spoke about committing suicide, and when Mrs. Bagshaw asked her what would become of the children she said she "would take them with her". Mrs. Williams did not attempt to deny having made the statement other than to say she was only joking. Well, that is no joking matter to me; mothers have been known to do such things, and I must confess it made a bad impression upon me.

Now I refer to these instances,—and I might refer to others also,—simply to show the general living conditions of the Petitioner's family in marked contrast to those under which Doris Ann now lives. It is apparent from the evidence that there is no comparison between the living conditions prevailing in the home of the mother with those in the home which Doris Ann now enjoys.

In the light of these conditions which I have referred to, should I take Doris Ann from a home of every comfort and happiness and from her aunt who can give her many advantages her mother cannot, and send her back to the relief role of Glen Cove for the next ten or fifteen years, from which I see no escape unless perchance the financial condition of the mother changes. Am I to return Doris Ann to a life of poverty? Anyone with any sense at all would want to restore a child to its mother; surely I want to. But to do so in this instance would be an act of rank injustice to the child. And may I say, parenthetically, that I fully appreciate that material things and comforts are not the all of life. To put my problem in another way, am I to make the quite natural desires and affections of the mother the sole criterion, rather than the welfare of this child, in determining where she shall live for the present at least? That makes the mother's interests paramount and not those of the child. In the light of the law of this state, which is clear and explicit, namely that the welfare and happiness of the child is the prime consideration, it is clearly not my duty to send this child to the relief role of Glen Cove, New York.

Now, there is another factor in this case which is important and cannot be ignored. It concerns the religious upbringing of this child, which it was quite apparent during the trial was

the paramount issue with the mother. I fully appreciate this and I have, therefore, given it much thought and consideration. One's religious practices and beliefs should be respected and safeguarded. We expect it from others and we should give to others what we expect of them. Indeed, the law of this state recognizes this principle, for by **Section 1922 of the General Statutes, Revision of 1930,** concerning the "Placing of children under four years of age in homes" it is provided that in the placing of such children the religious beliefs of the parent shall be respected.

Now simply because misfortune has overtaken this child is no reason why she should have to forfeit the faith in which she was baptized and that of her mother. Doris Ann was born and baptized a Catholic. She should be brought up in that faith. Material gains and advantages mean nothing in comparison with one's faith. To the worthwhile Catholic his faith is a gift to be appreciated and valued and not lightly cast aside as one would discard a garment. The mother of this child wants her brought up in the Catholic faith. In the light of the legislative enactment I have referred to above it is clearly the policy of the state that such wishes should be respected and carried out. When the mother gave Doris to Mrs. Stotts she expressed her desire, as I have already said, that the child be brought up in the religious faith of her baptism. Mrs. Stotts did not agree to this. Nevertheless, the mother let her take the child. I suppose in her distress she could do little else, although she had the opportunity at that time of putting her in a Catholic institution near Glen Cove. She knew, however, that the child would have a good home with her sister-in-law and had no hesitancy in letting Mrs. Stotts take her.

This problem, however, seems to have resolved itself. Mrs. Stotts stated in her testimony that from conversations with friends she had come to realize the attitude of Catholics in this regard and that she appreciates it. She further stated several times under oath, and her counsel repeatedly asserted during the trial and arguments, that Mrs. Stotts and her husband are now willing and glad to see to it that Doris receives the necessary instruction in the faith in which she was baptized. Indeed, the Stotts seem anxious to do this, suggesting that I name the conditions under which this duty might be fulfilled. In the light of the fact that she has taken an oath to respect this child's faith, I believe she will keep it. She asks my advice

and assistance. I give it to her. She is to take immediate steps to teach this child, now four years old, her Catholic prayers. There should be no difficulty in that regard. When of school age, if the child is still with her, she is to send her to a Parochial School. If she in the meantime needs any help or guidance in seeing that Doris Ann gets that to which she is entitled, namely, a Catholic religious training, I am sure that the Catholic religious authorities of the parish in which she lives will see that she gets it.

There is nothing permanent in the order of custody which I am about to make. Changed conditions in the future may easily bring about a different conclusion.

I commit this child to the continued custody of the Respondent, Gladys Stotts, with the distinct understanding regarding her religious faith I have stated above. In addition, the mother and brothers of this little girl are to see her at every opportunity they have. Indeed, Mrs. Stotts should see to it that the child is continually reminded of her mother and brothers, and nothing should be done to subtly wean her away from them. Decency and fairness alone dictate that this should be the attitude of the Respondent.

The Writ is dismissed for the foregoing reasons, and on the conditions stated.